FILED

AUG 28 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| Boumediene, et al. v. Bush, et al. | ) | Case No. 04cv1166 (RJL) |
| | ) | |
| Sliti, et al. v. Bush, et al. | ) | Case No. 05cv429 (RJL) |
| | ) | |
| Kabir, et al. v. Bush, et al. | ) | Case No. 05cv431 (RJL) |
| | ) | |
| Al-Oshan, et al. v. Bush, et al. | ) | Case No. 05cv533 (RJL) |
| | ) | |
| Mammar v. Bush, et al. | ) | Case No. 05cv573 (RJL) |
| | ) | |
| Al-Sharekh, et al. v. Bush, et al. | ) | Case No. 05cv583 (RJL) |
| | ) | |
| Al Hamamy, et al. v. Bush, et al. | ) | Case No. 05cv766 (RJL) |
| | ) | |
| Hamoodah v. Bush, et al. | ) | Case No. 05cv795 (RJL) |
| | ) | |
| Khan v. Bush, et al. | ) | Case No. 05cv1010 (RJL) |
| | ) | |
| Al Ginco v. Bush, et al. | ) | Case No. 05cv1310 (RJL) |
| | ) | |
| Ghazy, et al. v. Bush, et al. | ) | Case No. 05cv2223 (RJL) |
| | ) | |
| Rimi, et al. v. Bush, et al. | ) | Case No. 05cv2427 (RJL) |
| | ) | |
| Rumi, et al. v. Bush, et al. | ) | Case No. 06cv619 (RJL) |

MEMORANDUM OPINION
(August 28, 2006)

The Department of Justice ("the Department") has filed a self-described "prophylactic" motion[1] with this Court on behalf of Respondents (or "the Government") in all seventeen of the Court's Guantanamo cases pending as of July 7, 2006,[2] seeking: (1)

---

[1]   See Mot. Hr'g Tr. at 8, 10, 13, 34, Aug. 16, 2006.

[2]   While the Department filed its Motion originally in all seventeen of the Court's Guantanamo cases, the Motion has since been withdrawn in three of the Court's cases. (See Khalid
(continued...)

authorization to review possible attorney-client communications that might be mixed in among a large trove of documents seized from the Guantanamo detainees by the Naval Criminal Investigative Service ("NCIS") pursuant to an investigation into a recent series of suicides and prison disturbances; and (2) a judicially approved set of procedures by which the Department may conduct its review and use of these potentially privileged documents. (*See generally* Resp'ts' Mot. for Procedures Related to Review of Certain Detainee Materials & Req. for Expedited Briefing ("Resp'ts' Mot.").[3])

Although the Department openly concedes that this Protective Order is in conflict with its stated position that this Court does not have jurisdiction to provide either form of relief as a result of the overarching jurisdictional issues currently pending before our Circuit Court (*see* Hr'g Tr. at 13-15), it nonetheless, in an abundance of caution, seeks the Court's relief in the event the Court should decide to exercise jurisdiction under its plenary authority to enforce the previously entered Protective Order, which addresses, *inter alia*, procedures for counsel's access to their clients in Guantanamo. (*See generally* Am. Prot. Order & Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay,

---

[2](...continued)
*v. Bush*, No. 04cv112; *Al Khaiy*, No. 05cv1239; *Al Bihani v. Bush*, No. 05cv1312, Notice of Withdrawal of Resp'ts' Mot. for Procedures Related to Review of Certain Detainee Materials & Req. for Expedited Briefing.) Additionally, the habeas petition in *Al Yafie v. Bush*, No. 05cv2399, was dismissed with the consent of the parties on August, 11, 2006; thus, as of that date, the Department's Motion is pending in the thirteen cases listed in the caption of this Opinion.

[3]   The Department filed identical motions and reply briefs seeking the above-mentioned relief in all of the Guantanamo detainee cases before this Court. Thus, when citing to Respondents' Motion and/or Reply, the Court need not—and will not—specify a particular case in which the pleading was filed.

Cuba ("Am. Prot. Order").[4])

For the following reasons, both prudential and jurisdictional, the Court concludes: (1) that it no longer has jurisdiction to grant the Government relief in the two cases currently on appeal in our Circuit;[5] (2) that it does not have any basis to act under the circumstances with which it is presented in the four cases where the Protective Order has not been entered; and (3) that as a matter of prudential deference, the Court should not exercise jurisdiction and insinuate itself to provide this form of prophylactic relief in the eight additional cases that are currently stayed pending the outcome of the overarching jurisdictional issues on appeal in our Circuit.

Accordingly, the Respondents' Motion is DENIED, leaving the Department to establish whatever procedures it believes are not only consistent with the spirit and letter of the Protective Order, but that will withstand judicial review by whatever Court is eventually held to be the appropriate forum to resolve these issues.

## FACTUAL BACKGROUND

On June 10, 2006, three detainees at the U.S. Naval Base at Guantanamo Bay, Cuba,

---

[4] The Amended Protective Order ("Protective Order") was initially entered in fourteen Guantanamo detainee actions—consolidated for the purposes of coordination and management (*see Khalid v. Bush*, 04cv1142, Order (Dkt. No. 7); Order (Dkt. No. 23))—by Judge Joyce Hens Green on November 8, 2004 (*see, e.g., Khalid v. Bush*, 04cv1142, Am. Prot. Order). As noted below, the Protective Order has been entered in twelve of the cases before this Court: two that are on appeal and ten that are stayed pending appeal.

[5] Petitioners' withdrew their Motion in *Khalid* on July 20, 2006, "because Mr. Khalid is not at Guantanamo anymore, so he didn't have materials seized." (Hr'g Tr. at 13.) Thus, of this Court's two cases that are currently on appeal, Petitioners' Motion is pending only in the *Boumediene* matter.

were found in their cells, each apparently having committed suicide using torn bed sheets to hang themselves. (Resp'ts' Mot. at 3.[6]) Less than a month before these suicides, on May 18, 2006, two detainees reportedly overdosed on medications provided by Guantanamo staff in response to sick calls and general medical treatment; it is believed that these detainees clandestinely stockpiled their medications to make the overdose possible. (*Id.* at 4.) That same day, a number of detainees lodged in a communal housing facility ambushed and attacked guards using weapons fashioned from fans and other materials in the housing bay. (*Id.*) According to Respondents, recent searches of detainee cells have uncovered a systematic hoarding of medications. (*Id.*) Some detainees have been discovered hiding medicine in their waistbands; another in his prosthetic limb. (*Id.*)

In response to the events of June 10, 2006, the NCIS initiated an investigation into "the circumstances and cause of death with respect to the recent suicides."[7] (*Id.*) A preliminary investigation of the cells of the three deceased detainees and of the detainees in the same cell block revealed several notes related to the suicides that had been written on paper and envelopes stamped as attorney-client privileged material.[8] (*Id.* at 5-6.) This discovery led the NCIS to suspect that some detainees might be using paper and envelopes

---

[6] All citations to the parties' pleadings incorporate the sources relied upon therein.

[7] The NCIS is the primary criminal investigative service of the Navy and investigates all deaths associated in any way with that branch of our Armed Forces. (Resp'ts' Mot. at 4.) Because the Navy has primary jurisdiction over Guantanamo Bay, it is the province of the NCIS to investigate the June 10, 2006 suicides. (*Id.*)

[8] Prior to the suicides, counsel visiting Guantanamo had been permitted to provide paper to their clients for their use in writing to counsel. (Resp'ts' Mot. at 5.)

4

labeled as confidential attorney-client material to communicate with one another without the guards' knowledge and to expand its investigation to include the possibility of future coordinated suicides. (*Id.* at 5, 8.) This suspicion and resulting investigatory expansion was the initial basis for the NCIS's global seizure of all written materials from the detainees on June 14, 2006. (*Id.* at 5.)

According to Respondents, the initial sorting of the detainees' materials made clear that their review and translation would be "a burdensome undertaking given the volume of materials and the apparent multitude of foreign languages." (*Id.* at 7.) Because the sorting process revealed the likelihood that actual attorney-client communications would be encountered, further review of the material was suspended until procedures and staffing could be developed appropriate for the scope of the undertaking and that would account for the possibility that the review team could encounter potentially privileged attorney-client communications. (*Id.* at 7-8.) Ultimately, the Department filed this Motion on July 7, 2006, seeking judicial authorization and approval of its proposed procedures to conduct its review.

## LEGAL BACKGROUND

In the cases of *Khalid v. Bush*, No. 04cv1142, and *Boumediene v. Bush*, No. 04cv1166, this Court was presented with "the novel issue of whether there is any viable legal theory under which a federal court could issue a writ of habeas corpus challenging the legality of the detention of non-resident aliens captured abroad and detained outside the territorial sovereignty of the United States, pursuant to lawful military orders, during a Congressionally authorized conflict." *Khalid v. Bush*, 355 F. Supp. 2d 311, 314 (D.D.C.

2005). On January 19, 2005, the Court held that there is "no viable theory" under which it could issue the writs of habeas corpus sought by Petitioners in the cases of *Khalid* and *Boumediene*. The Court further found that, "with respect to [Petitioners'] allegations that the *conditions* of their custody might violate existing United States law, such alleged conduct, even if it had occurred, . . . does not support the issuance of a writ because, though deplorable if true, it does not render the *custody* itself unlawful." *Id.* at 324 (emphasis in original). Accordingly, a Final Judgment dismissing the *Khalid* and *Boumediene* habeas petitions was entered on February 18, 2005.

Soon after the Court issued its Final Judgment, Petitioners filed timely notices of appeal in *Boumediene* on February 22, 2005, and in *Khalid* on February 23, 2005.[9] As new habeas petitions were filed, even after the Court issued its decision dismissing *Khalid* and *Boumediene*, Respondents moved for—and the Court granted—a stay of the proceedings in each new matter pending the result of the *Khalid/Boumediene* appeals. In their motions to stay, Respondents argued, *inter alia*, that, in light of the pending appeals in *In re Guantanamo Detainee Cases*,[10] *Khalid*, *Boumediene*, and *Hamdan*,

---

[9]  Our Circuit docketed these appeals as 05-5062 (*Khalid*) and 05-5063 (*Boumediene*) and later consolidated their review.

[10]  On January 31, 2005, Judge Joyce Hens Green issued a Memorandum Opinion in eleven other Guantanamo Bay detainee cases consolidated for consideration, holding, contrary to the prior decision of this Court, that constitutional due process protections apply to aliens detained at Guantanamo Bay and that the Combatant Status Review Tribunal proceedings the military has used to confirm detainees' status as enemy combatants do not satisfy these due process requirements. *See generally In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). Further, Judge Green agreed with the decision of Judge Robertson in *Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152, 165 (D.D.C. 2004), *rev'd*, 415 F.3d 33 (D.C. Cir. 2005), *rev'd and remanded*, 126 S. Ct. 2749

(continued...)

> [i]t makes no sense for the cases to proceed prior to resolution of the appeals; further proceedings would require the expenditure of significant judicial and other resources that may be avoided as a result of the appeals, and, in any event, such proceedings very likely would have to be revisited or relitigated once the appeals are decided and the Court of Appeals provides guidance regarding handling of the claims in these Guantanamo detainee cases.

(*See, e.g., Sliti v. Bush*, No. 05cv429; *Kabir v. Bush*, No. 05cv431, Resp'ts' Mot. to Stay Proceedings Pending Related Appeals & for Continued Coordination ("Resp'ts' Mot. to Stay") at 1.) In support of their position, Petitioners' cited to Judge Kessler's statement in her stay order in *Al Marri v. Bush*:

> The opinions resolving Judge Leon's and Judge Green's cases encompass and discuss many of the precise issues raised in Respondents' Motion [to Stay]. Thus, until the Court of Appeals addresses these issues, the law in this Circuit is unsettled, since Judge Green and Judge Leon reached different conclusions about many of the issues before them. Requiring this case to proceed before appellate resolution of those cases therefore would involve an unnecessary expenditure of judicial resources.

(Resp'ts' Mot. to Stay at 6 (citing *Al Marri*, No. 04cv2035 (GK) (Dkt. No. 26)).)

After months of briefing, on September 8, 2005, our Circuit Court held its first oral argument in the *Khalid/Boumediene* and *In re Guantanamo Detainees Cases* appeals. Before the Circuit Court could issue an opinion, however, on December 30, 2005, Congress enacted the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (2005) ("DTA"). The Act, *inter alia*, amends 28 U.S.C. § 2241 to remove jurisdiction from the

---

[10](...continued)
(2006), and concluded that the Third Geneva convention is "self-executing" and can provide Petitioners with a claim in a habeas action. *See In re Guantanamo Detainee Cases* at 478-80. Judge Green did, however, dismiss Petitioners' remaining constitutional, statutory, international law, and treaty claims. *Id.* at 480-81.

District Court to hear or consider applications for writs of habeas corpus and other actions brought in our Court by or on behalf of aliens detained at Guantanamo Bay, and creates an exclusive review mechanism in the District of Columbia Circuit Court to address the validity of the detention of such aliens held as enemy combatants. DTA § 1005(e)(1), (h)(2). In response, the Department argued that the DTA immediately and retroactively divested our Court of jurisdiction over the detainee habeas cases and, conversely, vested "exclusive" jurisdiction in our Circuit Court "'to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant.'" (*Khan v. Bush*, No. 05cv1010, Resp'ts' Opp'n to Pet'r's Mot. for Immediate Issuance of Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2243 or, Alternatively, to Issue Order to Show Cause at 1-2 (quoting DTA § 1005(e)(1)).) Indeed, since its passage, the Department has consistently maintained that our Court "has no jurisdictional basis" to afford detainees relief and that affording relief "would be an assertion of jurisdiction and authority in the case inconsistent with the [DTA]'s withdrawal of habeas jurisdiction of this Court and investment of exclusive jurisdiction in the Court of Appeals." (*See, e.g., Al Yafie v. Bush*, No. 05cv2399, Resp'ts' Mem. in Opp'n to Pet'rs' Mot. for Entry of Prot. Order at 2, 3.) Petitioners, disagreeing with Respondents' interpretation of the Act, have contended that the DTA's jurisdictional provisions do not apply to habeas petitions pending prior to its enactment. (*See, e.g., Khan v. Bush*, No. 05cv1010, Reply to Govt.'s Opp'n to Mot. Seeking Entry of Prot. Order at 3-5.) In part in response to this clear disagreement, the Court of Appeals ordered additional briefing on the effect of the DTA on the pending appeals and held

8

another round of oral argument on March 22, 2006.

But again before the Circuit Court could issue an opinion on the pending appeals, the legal landscape was altered once more. On June 29, 2006, the U.S. Supreme Court decided *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), a challenge to a Guantanamo Bay habeas petitioner's designation for trial by military commission. While the Supreme Court in *Hamdan* held that section 1005(e)(1) of the DTA did apply to habeas petitions pending prior to December 30, 2005, it left open the question of the effect of the exclusive review provisions of the Act on other cases, stating that "[t]here may be habeas cases that were pending in the lower courts at the time the DTA was enacted that do qualify as challenges to 'final decision[s]' within the meaning of subsection (e)(2) or (e)(3). We express no view about whether the DTA would require transfer of such an action to the District of Columbia Circuit." *Hamdan*, 126 S. Ct. at 2769 n.14.

Thus, with the question of our Court's jurisdiction still in limbo, the Court of Appeals once again needed to order supplemental briefing—this time at the Department's request—on the effect of *Hamdan* on the pending appeals. It was not until August 15, 2006, less than two weeks ago, that briefing closed in that matter. The next day, oral argument was heard in these cases.

## ANALYSIS

This Court currently has sixteen Guantanamo habeas petitions pending before it[11] that are in four distinct procedural postures: (1) two that are on appeal to our Circuit (i.e., *Khalid*

---

[11] *See supra* note 2.

and *Boumediene*); (2) ten that have been stayed pending the appeal in *Khalid* and *Boumediene* and in which the Protective Order has been entered; (3) two that have been stayed and in which no protective order has been entered; and (4) two in which no protective order or stay has been entered.[12]

Both the Department and the detainees' counsel concede that as to those in the first category, this Court no longer has any jurisdiction. (*See Boumediene v. Bush*, No. 04cv1166, Statement of Boumediene Pet'rs Re: Court's Order of Aug. 9, 2006; Hr'g Tr. at 13-14.) The Court agrees. The taking of an appeal to our Circuit Court divests this Court of any jurisdiction pending the resolution of the appeal.[13] Accordingly, as to these cases, this Court simply has no legal basis upon which to assert jurisdiction.[14]

---

[12] Once the DTA became law, Respondents opposed the issuance of the Protective Order in those cases in which the Protective Order was not yet entered, and ceased to move for stays in those cases in which stays were not yet in place, arguing that the Court no longer had jurisdiction to issue such relief. (*See, e.g., Khan v. Bush*, 05cv1010, Resp'ts' Mem. in Opp'n to Pet'r's Mot. Seeking Entry of Prot. Order at 1-2.) Pending the resolution of the Guantanamo detainee cases on appeal, the Court has not acted in a substantive manner in any of the now-sixteen cases pending before it.

[13] As the United States Supreme Court held in *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982): "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *See also Princz v. F.R.G.*, 998 F.2d 1 (D.C. Cir. 1993); *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) ("It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court."). One rationale for this rule is that the "[c]ontinuation of proceedings in the district court largely defeats the point of the appeal and creates a risk of inconsistent handling of the case by two tribunals." *Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*, 128 F.3d 504, 505 (7th Cir. 1997).

[14] Despite the fact that this Court technically retains jurisdiction over the habeas petitions filed after the dismissals of *Khalid* and *Boumediene*—petitions that raise the same
(continued...)

10

As to the second, third, and fourth categories of cases, Petitioners' counsel rely upon the existence of an earlier protective order, even in those cases where one has never been entered, as the basis for this Court to exercise its plenary authority to enforce it by ordering the return of the materials in question to each detainee, or at a minimum, to construct procedures that will assure detainees' counsel's input in the evaluation of which, if any, documents might be covered by the privilege. Thus, in the final analysis, notwithstanding the overarching jurisdictional questions, detainees' counsel also advocate that this Court should insinuate itself into this situation—regardless of the possibility that the Court of Appeals could conclude, in the aftermath of the DTA and *Hamdan*, that our Court has no jurisdiction over detainee issues whatsoever. Such an approach—for the following reasons—does not strike this Court as prudentially sound under these circumstances.

First, the Protective Order, upon which detainees' counsel so heavily rely, not only does not specifically address this situation, but was principally designed to accomplish a very different purpose than that for which the detainees seek to employ it: i.e., the protection of

---

[14](...continued)
overarching legal issues as the petitions dismissed in those actions—the Court sees no reason why the rationale underlying transfer of jurisdiction should not be extended to the pending petitions. It is true that this Court could very well have made a merits determination, consistent with its disposition in *Khalid* and *Boumediene*, dismissing all habeas petitions filed by the detainees. At that point, each successive Petitioner would have the right to file an appeal, and jurisdiction would transfer to our Circuit Court. While the Court did not choose to proceed in that manner—issuing stays rather than orders of dismissal—all of the habeas petitions pending before this Court are essentially in the same position as *Khalid* and *Boumediene*. Though this Court is mindful that the Court of Appeals does not in fact have jurisdiction over the post-*Khalid/Boumediene* habeas petitions at this time, it raises this point to once again stress the complexity of the circumstances under which it now operates.

11

national security information.[15] If the detainees were seeking this Court's involvement under circumstances that the Protective Order either directly addressed or was designed to protect, it would be a much closer call as to whether this Court should take a position inconsistent with its denial in *Khalid/Boumediene* of judicial review of conditions of detention[16] and rely upon the Protective Order as a basis to insinuate itself at a time when the ongoing jurisdictional authority of our Court is under consideration in our Court of Appeals.

Moreover, there is nothing about the circumstances of this situation that would or will prevent this, or another court at a later time, from ensuring that any information learned by

---

[15] The stated purpose of the Protective Order, as set forth in its preamble, is "to prevent the unauthorized disclosure or dissemination of classified national security information and other protected information that may be reviewed by, made available to, or are otherwise in the possession of, the petitioners and/or petitioners' counsel." (Am. Prot. Order at 1.) While paragraph six of the Protective Order "specifically incorporates by reference all terms and conditions established in the procedures contained in Exhibit A[, the "Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba,]" it does so only "to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handing of information." (Am. Prot. Order at 2.) Thus, the Protective Order is protective only in the sense that it seeks "to prevent the unauthorized disclosure or dissemination of classified national security information"; it is not an order of the Court particularly aimed at protecting or safeguarding Petitioners.

[16] As this Court pointed out in *Khalid*:

> [T]he absence of federal court review of the conditions of the detention of a non-resident alien is . . . consistent with the text of the Constitution and other Supreme Court precedent. The Founders allocated the war powers among Congress and the Executive, not the Judiciary. As a general rule, therefore the judiciary should not insinuate itself into foreign affairs and national security issues.

*Khalid*, 355 F. Supp. 2d at 329. Thus, it would seem to the Court, consistent with its opinion in *Khalid*, that the conditions under which a detainee is held—which are clearly implicated by Respondents' Motion—are the province of the Executive Branch to work out, with Congress's input, should it choose to give it; but it is not the province of the judiciary to insinuate itself into that process. If this Court were to act under these circumstances, it would be doing precisely that which it previously said it should not—and cannot—do.

the Government's reviewers is never used by the Government against any detainee in the future. Thus, no imminent or future irreparable harm will befall the detainees that might warrant this extraordinary assertion of jurisdiction under these legal and factual circumstances.

Finally, this is *not* a situation where the detainees, in any way, are either being deprived of access to their counsel or deprived of the ongoing system to protect future attorney-client communications that was established by the Protective Order entered in these cases. Simply stated, the documents in question here that *might* be classifiable as attorney-client communications are discrete in number and limited in their time frame. For this Court to insert itself under these circumstances, there needs to be a more fundamental and ongoing infringement of the detainee-attorney relationship that would cause future limitations on their ability to communicate with counsel. That is not the situation here.[17]

Thus, for all of the above reasons, the Court believes it is prudentially better to refrain from asserting its plenary authority over the Protective Order, under circumstances where

---

[17] The Court notes in this regard, as the Respondents have argued (*see* Resp'ts' Mot. at 15-16; Hr'g Tr. at 90), that the attorney-client privilege "is based in policy, rather than in the Constitution, and therefore cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." *United States v. Grant*, No. 04 CR 207BSJ, 2004 WL 1171258, at *2 (S.D.N.Y May 25, 2004) (quoting *United States v. Stewart*, No. 02 CR. 396 JGK, 2002 WL 1300059, at *5 (S.D.N.Y. June 11, 2002) and *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991)). In circumstances such as these—where the Respondents' stated interest is "potentially saving lives and in maintaining security and order within a wartime detention facility" (Resp'ts' Mot. at 16)—the Court believes that the policy interest underlying the attorney-client privilege, as applied in these limited circumstances, is not enough to compel this Court to act at this time. It takes no position, however, on the relative weights of the competing policy interests should they be balanced against each other at a later time or under different circumstances.

the Court of Appeals could shortly determine that these matters are *not* the province of this Court. Hopefully, the Department will implement a review system mindful that its merits, undoubtedly, will be reviewed by whatever Court is ultimately held to be responsible for these issues.[18]

Accordingly, for all of the reasons stated above, the Department's Motion pending in each of the Court's above-captioned cases is DENIED. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[18]  Should Respondents—in light of this Court's deference to the Court of Appeals, the Executive Branch, and Congress—choose to move forward with the review of Petitioners' potentially privileged material at this time, they do so at their own legal peril. As the Court warned Respondents at its August 16, 2006 hearing on their Motion:

> If [Respondents] put in place a system [of review] that doesn't give a detainee's counsel the option of having a different point of view of whether or not something should be protected under the attorney-client privilege such that a third party can resolve the dispute, then you are creating a situation that's going to be probably the subject of more and more litigation in the months and years to come.

(Hr'g Tr. at 91.) Thus, if the Respondents choose to go forward with their review, they must be prepared to—at a later time, and in a forum to be determined—justify whatever procedures they put in place.